EDWARD W. PENDLETON v. EDWIN W. ELLIOTT ET AL.

*Mortgage foreclosure—Insurance of mortgagee's interest—Subrogation.*

1. If a mortgagee obtains insurance on *his own account*, and the premium is not paid by or charged to the mortgagor, he cannot claim the benefit of a payment of the insurance. *Ins. Co. v. Woodbury*, 45 Me. 447; *White v. Brown*, 2 Cush. 412; *Stinchfield v. Milliken*, 71 Me. 567.

   If, however, the policy contains no stipulation for subrogation in case of payment to the mortgagee, and there is any arrangement between the mortgagor and mortgagee, either verbal or written, by which the mortgagor becomes liable to pay for the insurance, he is entitled to have it applied in liquidation of the mortgage debt *pro tanto*, which right does not depend upon the fact that he has paid for the insurance, nor whether the mortgagee procured it intending to look to the mortgagor for reimbursement of the premium, but upon whether he is liable to the mortgagee therefor under any agreement, express or implied; and in such case, if the insurer receives the premium knowing that it is paid by the mortgagor, or for him, he will not, in the absence of a stipulation therefor in the policy, be entitled to be substituted to the rights of the mortgagee against the mortgagor. *Kernochan v. Ins. Co.*, 17 N. Y. 428, 441; *Cone v. Ins. Co.*, 60 Id. 619, 624.

2. In this case, in a review of the testimony, it is held that the insurance of complainant's mortgage interest was for the benefit of the mortgagor.

Appeal from St. Joseph. (Pealer, J.) Argued October 13 and 14, 1887. Decided November 10, 1887.

Bill to foreclose a mortgage. Complainant appeals from decree dismissing bill. Affirmed. The facts are stated in the opinion.

*D. E. Thomas* and *H. H. Riley*, for complainant.

*J. W. Flanders*, for defendants.

CHAMPLIN, J. This is a proceeding in chancery to foreclose a mortgage executed by defendants Edwin W. Elliott and Amanda H. Elliott, of date July 16, 1873, to secure the payment of $6,529.12, in five equal annual installments of $1,305.82, evidenced by five notes bearing that date, payable in one, two, three, four, and five years.

The premises covered by the mortgage were situated in the village of Sturgis, St. Joseph county, Michigan, upon which was a hotel.

The mortgage contained no stipulation or agreement requiring the mortgagor to insure for the mortgagee's benefit.

On the twenty-seventh day of September, 1873, the St. Joseph County Village Fire Insurance Company issued and delivered to E. W. Pendleton, mortgagee, a policy of insurance on the mortgage interest of the mortgagee in the hotel building for $2,000. The hotel was totally consumed by fire on the nineteenth day of March, 1876, and the insurance company paid the $2,000 to the mortgagee.

The policy contained no provision that, in case of loss and payment of the insurance, the company should be entitled to subrogation.

The question in dispute is whether the mortgagor is entitled to have the insurance money applied in reduction of the mortgage debt. The right of the insurance company to be subrogated to the rights of the mortgagee does not arise in this suit, except so far as the question may be involved in the dispute between the parties to the mortgage. It was conceded upon the argument that the insurance company has as yet made no claim to be subrogated.

The law is well settled that if the mortgagee obtain insurance on his own account, and the premium is not paid by or charged to the mortgagor, he cannot claim the benefit of a payment of the insurance. *Insurance Co. v. Woodbury*, 45 Me. 447; *White v. Brown*, 2 Cush. 412; *Stinchfield v. Milliken*, 71 Me. 567.

If, however, the policy contains no stipulation for subrogation in case of payment to the mortgagee, and there is any arrangement between the mortgagor and mortgagee, either verbal or written, by which the mortgagor becomes liable to pay for the insurance, he is entitled to the benefit thereof, and to have it applied in liquidation of the mortgage debt *pro tanto;* and his right in this respect does not depend upon the fact that he has paid for the insurance, nor whether the mortgagee procured the insurance intending to look to the mortgagor for reimbursement of the premium, but it depends upon whether he is liable to the mortgagee therefor under any agreement, express or implied. And in such case, if the insurer receives the premium knowing it is paid by the mortgagor, or for him, he will not, in the absence of a stipulation therefor in the policy, be entitled to be substituted to the rights of the mortgagee against the mortgagor. *Kernochan v. Insurance Co.*, 17 N. Y. 428, 441; *Cone v. Insurance Co.*, 60 Id. 619, 624.

The mortgagor, Elliott, claims that he procured the insurance upon the mortgagee's interest, and paid the premiums thereon. On the contrary, the complainant claims that he procured such insurance for his own benefit, and without any agreement whatever between himself and Elliott that it should be obtained. Both of these parties were examined as witnesses, and their testimony is as conflicting as it well could be, and both are more or less corroborated by facts and circumstances, which makes it extremely difficult to arrive at a very satisfactory solution of the case.

Mr. Elliott testifies positively that he obtained the insur-

ance in question, or applied for it, for Mr. Pendleton's benefit, and paid assessments upon it; that he transacted the business with J. Eastman Johnson, who was an officer of the company. Mr. Johnson, however, denies that he made application to or procured the insurance from him; and Mr. Charles Cooper, who was at the time agent of the insurance company for St. Joseph county, testified that Elliott applied to him for insurance upon the hotel, and he declined to take the risk,—did not want to carry any risk on it.

Mr. Pendleton testifies that he made the application and procured the insurance for his own benefit without Mr. Elliott's knowledge, and the original application was produced in evidence from the office of the insurance company, and it appears to be and is in Mr. Pendleton's handwriting, and signed by him; that Charles Cooper acted for the company in taking the application; that it was done at the Exchange Hotel, and no one was present but Cooper and himself. Mr. Cooper, however, testifies that he has no recollection of having received the application from Mr. Pendleton.

At the time this application was made John C. Joss was secretary of the company. He died in 1879, two years before this suit was commenced. The office filing indorsed upon the application is in the handwriting of Mr. Joss, and is as follows:

"ST. JOSEPH COUNTY VILLAGE FIRE INSURANCE COMPANY.
"*Application.*
"E. W. Pendleton, P. O. Sturgis.
"September 27, 1873.
"Class 9, $2,000.
"ASSESSMENTS
"To be paid by E. W. Elliott, Sturgis.
"Premium $\begin{cases} \$2.00. \\ \$3.50. \end{cases}$
"CHAS. COOPER,
"Agent."

The only fact of significance in the indorsement is that the assessments were to be paid by E. W. Elliott. Mr. Pendleton testifies that he gave no such instruction to the officers

or agents of the insurance company, and that the indorsement was placed upon his application without his knowledge or consent. Mr. Cooper testifies that he has no knowledge and does not know how or by whose direction the indorsement "Assessments to be paid by E. W. Elliott" came upon the application. Its existence there is an important fact; for if placed there by direction either of the mortgagee or mortgagor, and assented to by the company, it not only precluded the company from insisting on subrogation, but it was evidence that the insurance was intended for the mortgagee's benefit, and of an agreement that the mortgagor should pay the assessments, and, under the law, the insurance in case of loss would have to be applied by the mortgagee in reduction of the mortgage debt.

Now, if Mr. Pendleton, although he made and presented the application to the agent, gave no such information to the agent or officers of the company, it follows that Mr. Elliott must have done so. If he did not, it is very singular and unaccountable how such indorsement came to be made. A strong inference arises from this fact that some agreement must have been entered into by which Elliott was to pay the assessments.

The books of the company show, and the parties have stipulated, that assessments were paid upon the policy as follows:

March assessment, 1874, paid by E. W. Pendleton_____ $7 95
October assessment, 1874, paid by E. W. Elliott_____ 24 06
April assessment, 1875, paid by E. W. Elliott_____ 7 68
November assessment, 1875, paid by E. W. Pendleton  3 00
March assessment, 1876, paid by E. W. Pendleton____ 21 53

Thus it appears that, of the total assessments paid, Elliott paid $31.74, and Pendleton $32.48. Mr. Pendleton explains the payments of assessments by Mr. Elliott as follows:

"When the first note became due, that would be about July 16, 1874, Mr. Elliott said that he was unable to meet the note, and asked for an extension. The note was partly paid. He said that, owing to some old matters coming up

from La Grange that Mr. Ellison had, he was unable to pay it, and wanted further time. I told him that as money was worth 10 per cent., and that these notes were only drawing 7, and no interest due until the notes became due, I could not afford to give him further time; and also that I had been to the expense of getting my mortgage interest insured. He asked me, ' Have you got your mortgage insured?' and I told him I had. He asked me in what company. I told him in the St. Joseph County Village Fire Insurance Co. He said that was strange; the company had refused to give him a policy upon the building; and he then asked me how much it cost. I told him I did not know; it depended upon the losses the company sustained, and they made their assessments accordingly. He said that ' if you will not crowd me, and give me more time, I will pay your assessments for you until I can pay you.' I said, ' Very well, but you must pay it as soon as you can.' I think he paid the two next assessments,—the ones of the fall of '74, in October and April, '75.

"When the next note became due, which was about July 16, '75, he was considerably behind; I think somewhere about the amount of the second note. He said he had not got the money, but he would not pay any more assessments; that one of them was a heavy assessment. I asked him what he would do; I could not afford to let it stand in that shape at that rate of interest. He said he would pay 10 per cent. on all payments, and the interest of the same after they became due. I said then we might as well put it upon the papers, and he said, ' Well,' and I wrote out the statement on the back of the mortgage, and he signed it, and he paid no assessments after that.''

He also testified that he received the notices of assessments directed to himself through the mail.

Mr. Elliott was afterwards recalled, and further examined, but his attention was not called to the above testimony of Mr. Pendleton; neither did he deny it in express terms. He testified, however, that he paid all the assessments except the last, but is uncertain to whom he paid them, but thinks to Mr. Cummings, the collecting agent of the company. Mr. Cummings was dead at the time he gave his testimony.

The next testimony in order of time bearing upon the ques-

tion is that of J. Eastman Johnson, who went to Sturgis to investigate the loss immediately after the fire. He swore both Mr. Elliott and Mr. Pendleton, and made written *memoranda* of their statements. His *memoranda,* which were introduced in evidence, show that Mr. Elliott at that time stated to Mr. Johnson that he had $2,000 insurance in the Home Insurance Company of New York, and $1,000 on the furniture, and that all his policies were for his own benefit, and that he held none for Mr. Pendleton's benefit. It is claimed that this statement shows that Elliott at that time did not make any claim to the insurance held by Pendleton; but I do not think any such inference follows. Pendleton was present and was sworn at the same time, and the examination was being made for the purpose of adjusting the loss under Pendleton's policy. The statement of Mr. Elliott was directed to the policies which he held, and these he stated he held for his own benefit.

Mr. Johnson testifies that afterwards, and during the settlement of the loss, he had a conversation with Mr. Pendleton, in which he told Mr. Pendleton that the money should be applied as he thought upon the Elliott mortgage, the payment of which was partly secured by that policy. Mr. Johnson says that was the substance of his part of the conversation; that he might not have used those identical words; that Mr. Pendleton replied he thought he should so apply it; this was the substance of the conversation; that Mr. Pendleton also stated that he had other claims against Mr. Elliott.

This item of testimony has a bearing upon the right of the company to be subrogated to the mortgagee's interest. Mr. Johnson was president of the company when the application was made, and it already appears that the company understood that the insurance was for Mr. Elliott's benefit. Mr. Johnson was secretary of the company when adjusting this loss, and his testimony shows how the company understood the matter; that the mortgage was partly secured by

that policy.   Mr. Pendleton asserted no claim that it was not so secured, but said he thought he should so apply it.

The money was paid by the insurance company in install-ments, and when the company had raised between twelve and fifteen hundred dollars it desired to hand it over to Mr. Pendleton as partial payment.   Mr. Elliott testifies that Mr. Cummings came with the money, and he and witness went and hunted Mr. Pendleton up; that Cummings asked him to receive the money, and indorse it on the mortgage; that Pendleton said that he could not use that amount then, as he had no place to use it until he got the whole of it; that he said when he got the whole of it he would indorse it on; that the money was then paid into the bank for Mr. Pendle-ton's credit.   This statement is denied by Mr. Pendleton.

It appears without dispute that Mr. Elliott desired to rebuild the hotel.   He says he called on Mr. Pendleton, and requested him to loan him the money to rebuild with, and he told him that he could not let him have it.   Mr. Pendleton testifies that Mr. Elliott asked him if he would not let him have the $2,000 insurance money to assist him in rebuilding, and he told him he could not; that he told him if he would reduce the mortgage to $3,000 he would extend the time of payment of that amount for five years, or a portion of it, that is, it was all to be paid in the course of five years, and upon that they made such an agreement, which was put in writing, and, as he understood it, was recorded; that Mr. Elliott at that time paid him $862.69, being the balance due upon the second note, which had matured the July previous.

The agreement entered into at that time was as follows:

" *Whereas,* the Exchange Hotel, in the village of Sturgis, having been destroyed by fire, and there being due and to become due to Edward W. Pendleton, upon his mortgage upon said property, from Elwin W. Elliott, and the said property being insufficient to secure said sum of $5,526.61, the amount now remaining unpaid upon said mortgage, the said Elliott agrees to pay this day the balance due upon the

third installment of said mortgage, viz., $862.69, and to rebuild said hotel with brick.

"In consideration thereof said Pendleton agrees to loan upon said property to said Elliott the sum of $3,000 of· the unpaid installment of said mortgage, and, if said mortgage should be less than $3,000, then the same to be made up to that amount in money; said loan to be for the term of five years, with annual interest at ten per cent.; said installments that shall not be due when this agreement shall be consummated to be discounted so as to make them worth ten per cent. at the time of such loan.

"Said Elliott agrees to proceed to build said hotel within six months from this date.

"E. W. ELLIOTT.
"*Dated April 7, '76*.          E. W. PENDLETON.

"STATE OF MICHIGAN, ⎱ ss.
  St. Joseph County, ⎰

"I, Nicholas Hill, register of deeds in and for said county, do hereby certify that I have compared the copy of 'Copy of Contract' to which this is attached with the record of the original instrument, which said original is now of record in my office, and find the same to be a true copy of such record, and of the whole thereof. Said copy of contract was received for record on the nineteenth day of February, A. D. 1878, at 2 o'clock P. M., and was recorded in volume 2 of Miscellaneous Records, on page 226.

"Witness my hand at Centreville, in said county, [SEAL]   this eleventh day of July, A. D. 1885.

"NICHOLAS HILL,
"Register."

At the time this agreement was made the insurance money had not been received by Mr. Pendleton. He afterwards received, and gave receipts therefor to the company, as follows: April 25, 1876, $1,435; June 2, 1876, $165; July 11, 1876, $160; August 25, 1876, $160; February 10, 1877, $160; total, $2,020,—the twenty dollars being interest on the deferred payments.

The testimony of Mr. Elliott and of Mr. Pendleton conflicts with reference to the manner in which the mortgage debt was to be reduced to $3,000, as specified in the above agreement of April 7, 1876. Mr. Elliott says that the insur-

ance money when received was to be applied upon the mortgage, and that, if by such application the mortgage should be reduced below $3,000, he was to have sufficient money from Mr. Pendleton to make the mortgage up to $3,000. Mr. Pendleton says that the insurance money was not to be applied, and says that Elliott was to reduce the mortgage by payment, which he has never done. Both agree that the $862.69 was paid on that day, and it appears that Mr. Elliott went on and rebuilt the hotel with brick as specified in the agreement. I think Mr. Elliott's statement concerning the way the mortgage was to be reduced to $3,000 is the correct version of the affair It is supported by the peculiar language of the instrument. The mortgage was to be continued on the premises, "and, if said mortgage should be less than three thousand dollars, then the same to be made up to that amount in money." The words would be meaningless unless there was some amount to be applied on the mortgage which in the contemplation of the parties might reduce it below $3,000. If Elliott was to pay so as to reduce it to $3,000, such language would have been unnecessary. Pendleton makes no satisfactory explanation of this clause of the contract, and my conclusion is that it referred to the insurance money, and, if it did, it also follows that the parties understood from the beginning, taken in connection with the fact of the indorsement upon the application, and the payment by Elliott of part at least of the assessments, and the manifest understanding of the insurance company, that the insurance was for Mr. Elliott's benefit.

After the hotel was rebuilt, and on the thirteenth of April, 1878, Elliott conveyed the premises in question to Charles B. Buck, one of the defendants. Mr. Buck testifies that, previous to his purchase, Mr. Pendleton, Mr. Elliott, Benjamin Buck, and himself met in the office of Mr. Flanders, to see what was going to Mr. Pendleton,—to see what there was going to him,—so they could tell how much the balance was

that Mr. Elliott owed him. Mr. Pendleton had his papers there, and Mr. Flanders and Mr. Pendleton both figured the mortgage, and made the balance coming to Mr. Pendleton, as near as he could remember, about $3,200. He states there was no controversy at that time between the parties as to the amount due on the mortgage. The deed he received from Elliott contained the usual covenants of warranty, and it covenants against incumbrances, except mortgages of $8,000. These he says were the mortgage to Pendleton for $3,000, one to Burch of $4,000, and one to Wait of $1,000. Benjamin Buck corroborates C. B. Buck as to the meeting in Flander's office; says he can't recollect the exact amount they found due on the mortgage, but it was about $3,000. He is also corroborated by Mr. Elliott. Charles B. Buck purchased the property subject to Mr. Pendleton's mortgage, and afterwards made payments to Mr. Pendleton thereon as follows: November 4, 1878, $300; April 26, 1879, $700; September 20, 1879, the amount of a board bill, $90; and on December 14, 1881, he tendered to Mr. Pendleton $2,778, which he claims was the balance due Mr. Pendleton upon the mortgage.

Mr. Pendleton received the money tendered, but insisted that it did not pay the mortgage in full, and afterwards filed this bill to foreclose the mortgage for the balance which he claims to be due him thereon. It is conceded by the parties that, if the insurance money was applied towards the payment of the mortgage debt, the money tendered was sufficient to extinguish the mortgage.

The conclusion at which I have arrived is, after duly considering all the testimony, that the insurance of Mr. Pendleton's mortgage interest was for the benefit of the mortgagor, and was effected with the understanding that the mortgagor should pay the assessments therefor, and was liable to the mortgagee for the assessments he has paid therefor. Starting from the memorandum indorsed upon the application, and

following down through the whole course of the dealings between these parties, their actions are consistent with this fact, and inconsistent with the fact that the insurance was obtained by Mr. Pendleton for his sole and exclusive benefit. This conclusion reached, the question whether the tender was properly made or not is of no consequence.   The payment made discharged the lien of the mortgage, and it only remains for Mr. Pendleton to execute the formal discharge. The decree of the circuit court is affirmed, with costs.

SHERWOOD and MORSE, JJ., concurred.

CAMPBELL, C. J., did not sit.